UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 06-05 (WOB)

DUSTIN JERAULD, by and through
his Guardian, Patricia S.
Robinson, on behalf of
Patricia S. Robinson                                PLAINTIFF

VS.                         OPINION AND ORDER

TERENCE W. CARL, Jailer,
Kenton County, ETC., ET AL                          DEFENDANTS

        This matter is before the court on the motion of defendants
Ballard and Carl for summary judgment (Doc. #67), the motion of
defendants Parker, Stilt, Sams, and Bell for summary judgment
(Doc. #69), the motion of defendant Kroger for summary judgment
(Doc. #74), and the motions of defendants to strike certain
materials (Docs. #97, #98).

        Having previously heard oral argument on these motions, and
having taken the matter under submission (Doc. #108), the court
now issues the following Opinion and Order.

### Introduction

        This is indeed a tragic case.  On February 11, 2004, twenty-
one-year-old Dustin Jerauld (Jerauld) attempted suicide by
hanging himself with his bed linens while in pre-trial custody at
the Kenton County Detention Center (KCDC) in Covington, Kentucky.
Jail personnel intervened, and he survived.  However, Jerauld

sustained permanent brain injuries and remains in a persistent vegetative state.

Jerauld's mother and guardian, Patricia S. Robinson (Plaintiff), filed this action on January 6, 2006, alleging that defendants violated Jerauld's Eighth and Fourteenth Amendment rights by displaying deliberate indifference to his serious medical needs.

Plaintiff named as defendants, in their individual capacities only, the following persons:

| Name | Position |
|------|----------|
| Rodney Ballard | KCDC Chief Deputy |
| Claude Bell | KCDC Watch Commander |
| Terence W. Carl | Jailer of the KCDC |
| Mark Kroger | Jail Crisis Intervention Specialist (Psychologist) |
| Ramona Parker | KCDC Deputy |
| Pamela Sams | KCDC Nurse |
| Wehrner Stilt | KCDC Shift Commander |

Following discovery, all defendants moved for summary judgment, and those motions are now ripe for decision.

## Background[1]

### February 7, 2004

On February 7, 2004, Jerauld was arrested at his home on charges of burglary and drug possession by two officers of the Erlanger, Kentucky Police Department.  One of the officers was aware that Jerauld had a heroin addiction, and the officers found cocaine and heroin in Jerauld's possession at the time of arrest. Jerauld's father asked one of the arresting officers to notify the jail personnel that Jerauld had said that he would try to kill himself if he went to jail.  The officer assured Jerauld's father that he would do so, and he later instructed the second arresting officer of the same.

The officers transported Jerauld to the Erlanger Police Department, where he was interviewed by Sergeant Shawn Sims, the detective investigating the burglary for which Jerauld was arrested.  Jerauld made no statements during this interview about any intention to harm himself.

Following this interview, the second arresting officer transported Jerauld to the KCDC, where the officer informed **Shift Commander Wehrner Stilt (Stilt)[2]** that Jerauld had previously made suicidal statements and that they "needed to keep an eye on him."

---

[1]The parties include in their briefs many facts which the court considers irrelevant to disposition of the pending motions. Those facts are not included in this opinion.

[2]Defendants names are in bold to assist the reader.

Jerauld began the booking process at the KCDC, which included the completion of an "Inmate Medical Form" (IMF). This form contains twenty-seven questions about the inmate's personal history and health, including the following:

3. Are you now or have you ever been treated for mental health or emotional problems?

8. [Are you] now thinking of harming yourself or someone else?

15. Are you now thinking of killing yourself?

22. Have you ever attempted to kill yourself?

26. Have you tried to kill yourself while residing in hosp[ital], jail, residential facility?

Jerauld answered "no" to each of these questions. He did, however, indicate that he would probably "withdraw" from heroin.

The IMF was forwarded to **Shift Commander Stilt**. Although Jerauld's responses on the IMF did not raise concerns about suicide, based on what the Erlanger officer had told **Stilt**, he proceeded to interview Jerauld privately and complete a "Psychological Services Referral" (PSR) form.

The PSR contains numerous questions regarding the inmate's history of suicide, any present suicidal thoughts, and other psychological issues. Jerauld answered "no" to all such questions, yielding a score of "0." This score indicated no need for psychological referral. Based on the notation regarding possible heroin withdrawal, however, **Stilt** had Jerauld placed on

4

a 20-minute medical watch in an isolation cell.

Although not required to do so based on Jerauld's PSR score, **Stilt** nonetheless telephoned **Mark Kroger**, a licensed psychologist under contract with the KCDC as its Jail Crisis Intervention Specialist.  **Stilt** informed **Kroger** of the information regarding Jerauld's alleged past threat of suicide, the results of the IMF and PSR, and the fact that **Stilt** had placed Jerauld on a medical watch.  Based on this information, **Kroger** determined that Jerauld did not need to be placed on a suicide watch.

### *February 8, 2004*

The following day, Jerauld remained on medical watch in an isolation cell.  In the afternoon, he made telephone calls to his parents complaining that he was cold and having cramps.  During these calls, he also referenced thoughts of suicide.  It is undisputed that defendants were unaware of these statements.

Around 7:00 p.m., Jerauld complained to Certified Medication Aide (CMA)[3] Lynn Kloeker that he was suffering from heroin withdrawal symptoms.  Per standard orders, Kloeker gave Jerauld 50 mg. of the drug Vistaril.

### *February 9, 2004*

On the morning of February 9, Jerauld made two calls to his mother, begging her to get him out of jail and telling her that

---

[3]The CMAs make regular medication "passes," or rounds, to dispense medication to inmates.

he was going to hang himself.  Again, it is undisputed that defendants were unaware of these statements.

In the afternoon, Jerauld spoke to defendant **Pamela Sams (Sams)**, a licensed practical nurse who was Director of the KCDC Medical Unit.  Jerauld pleaded with **Sams** to release him from medical watch so that he could be moved to the general population.  Jerauld denied experiencing symptoms of withdrawal or emotional or behavioral problems.  **Sams** told Jerauld that the decision was not hers to make but that she would contact the appropriate people.

**Sams** then reviewed Jerauld's isolation log and spoke with Deputy Kathy Boyle, who reported that Jerauld had been doing well.  **Sams** then called **Kroger** and told him of Jerauld's request to be moved to the general population.

That evening, **Kroger** visited Jerauld at the KCDC and personally interviewed him for approximately twenty minutes. Jerauld denied having ever threatened to kill himself, although he admitted he had made the statement that he would rather be dead than go to jail.  In his deposition, **Kroger** described their conversation:

> . . .  In my interview with Dustin, he never reiterated to me having made any suicidal ideation, which, if you'll recall, is the only reason that I ever had a face-to-face anyway was because of – wasn't because of the policy or procedure called for it, it was because of what the arresting officer had said.  So once he had not indicated the presence of any suicidal statement to me, I directly

said to him, Dustin, I need to have one thing explained to
me then, I need to have explained to me why you threatened
to hurt yourself before you were brought to jail.  I said,
well, why would – why would a deputy tell us such a thing.
And he, Dustin, admitted to making a statement regarding
wishing he was dead.  I asked him what he meant by that.  He
said, somebody coming to jail, I've been here before, I know
what it's like, wouldn't you rather just kind of rather be
dead than go to the jail.  I said, well, again, were you –
do you mean you're going to hurt yourself because you're at
the jail.  No, I have no intention of hurting myself.

Denied suicidality, and said he had never told anybody that
he wanted to kill himself at the jail, that he had made a
statement, he would rather be dead than go to the jail, and
explained that statement, just as I've explained to you
here, that the jail is, you know, just a bad place to go, I
would rather be dead than go to the jail.

I asked him if he meant by that that he intended to harm
himself, and as I have reflected here in numerous spots, he
told me no, I don't want to hurt myself, I just meant jail
is an awful place to go.

(Kroger Depo. 56-57).  On his written psychological notes, **Kroger**

observed that Jerauld was able to smile and laugh, and that he

exhibited no lability.[4]  Jerauld also told **Kroger** that he was not

experiencing any heroin withdrawal symptoms, and **Kroger** observed

that Jerauld did not exhibit tremors, shaking, or avoidance.

Based upon this interview and his observations, **Kroger**

approved Jerauld's release into the general population upon

conclusion of the medical watch.

---

[4]This is the term used in Kroger's notes.  "Labile" is
defined, in pertinent part, as "constantly undergoing change."
*Webster's II New College Dictionary* 613 (2001).

7

### *February 10, 2004*

On the morning of February 10, the CMA on duty again gave Jerauld 50 mg. of Vistaril for complaints of heroin withdrawal. That afternoon, Jerauld was released from the medical watch and moved to a general population cell.

In the evening, while defendant **Watch Commander Claude Bell (Bell)** was making his rounds, Jerauld came to the door of his cell.  Jerauld was shaking, and he told **Bell** that he was cold and asked if he could have an extra blanket.  **Bell** authorized the extra blanket for nighttime hours.  Based on his observation of Jerauld, **Bell** did not have concern that he was suffering from the effects of withdrawal, only that the cell was cold.

Later, Jerauld telephoned his father and told him that he had not suffered any withdrawals, and that other than being cold he was fine.

### *February 11, 2004*

On the morning of February 11, Jerauld again complained to the CMA on duty that he was suffering withdrawal symptoms, and he again was given Vistaril.

Around 9:30 a.m., Jerauld's mother visited the jail.  She testified that Jerauld looked "rough" and "like he was hurting" due to withdrawal.  However, she did not think his complaints required immediate attention, nor did she speak to anyone at the

8

jail about any concerns.  She further testified that, based on her observation of her son that morning, she had no reason to believe that he would attempt suicide.

Around midday, Jerauld told Boyle that he was having withdrawals and was cold and needed medication.  Boyle explained that medication was given only twice a day, and Jerauld angrily demanded to "see her boss."  Jerauld then spoke with another CMA, who repeated what Boyle had told him.  A few minutes later, **Sams** entered the area, and Boyle told her of Jerauld's request.  The two women went to Jerauld's cell, where Jerauld was on his bed. He stood up and apologized to Boyle for yelling at her.

Jerauld and **Sams** then spoke for several minutes.  Jerauld told **Sams** that he was cold due to withdrawals and asked to keep the extra blanket that Bell had authorized.  **Sams** noted that Jerauld did not appear to be in distress and was alert and oriented.  She further noted that he did not present with tremors and that he denied abdominal cramping or loose stools.  **Sams** told Jerauld that a physician would follow up with him the following morning.  **Sams** also asked him if he was going to hurt himself, and he assured her he was not.

Boyle noted that Jerauld calmed down for the rest of the day, watched television, used the phone, spoke to cell mates, and rested in bed.  At approximately 5:00 p.m., Boyle served dinner, and Jerauld was polite and thanked her for his tray.

Jerauld phoned his parents several times after dinner, telling them that he was going to hang himself and complaining of withdrawal.  During one call, Jerauld suggested to his father that he call down to the jail and tell them that Jerauld had said he was going to hang himself in order "to get their attention." During another call, Jerauld told his father not to call the jail.

Shortly after 7:00 p.m., Jerauld flagged down defendant **Deputy Ramona Parker (Parker)**, who was conducting an inmate head count.  Jerauld told **Parker** that he was suffering withdrawal symptoms and that he "couldn't take it" and "needed something." **Parker** promised him that she would ensure that the CMA saw him first on the next medication pass that evening.

Jerauld again called his parents around 8:00 p.m.  Jerauld thanked his father for being a good dad and told him that he was going to hang himself with his sheets.  Jerauld's father testified that he did not believe his son.  Shortly thereafter, Jerauld called again and asked his father if he had reported his threat, telling his father not to because "I'll get in trouble."

Shortly before 9:00 p.m., Jerauld again spoke with his father.  Jerauld's father testified that his son sounded calm but said that he was hurting from withdrawals, and Jerauld asked his father to call the jail to inquire about his medicine.  Jerauld's father called the KCDC and spoke to someone in the Medical

10

Department, who told him that the medical personnel were up on Jerauld's floor dispensing medicine at that time.  Jerauld's father did not tell this person that his son had threatened to hang himself.

At approximately 9:25 p.m., **Parker** and the CMA who was coming to give Jerauld his medicine found him hanging in his cell from his bed sheets which were tied to an open, grid-type wall. Other inmates helped **Parker** get Jerauld down, and **Parker** and the CMA began CPR.  Jerauld was taken to the hospital, where he was treated.  However, Jerauld remains in a persistent vegetative state from which doctors have said he will not recover.

### *Analysis*

#### A.   Summary Judgment

Summary judgment is warranted where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "In considering a motion for summary judgment, [the court] view[s] the factual evidence and draw[s] all reasonable inferences in favor of the non-moving party." *Dominguez v. Correctional Med. Services*, 555 F.3d 543, 549 (6th Cir. 2009) (citation omitted).  "A mere scintilla of evidence is insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Id.* (internal quotations

11

and citation omitted).

## B. __Eighth Amendment Claim__

### 1. __The Standard: "Deliberate Indifference"__

Section 1983 prohibits any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" from depriving any U.S. citizen "of any rights, privileges, or immunities secured by the constitution and laws." Plaintiff argues that Jerauld's Eighth Amendment right to be free from cruel and unusual punishment was violated. U.S. Const. amend. VIII.

"As applied to prisoners, this constitutional guarantee encompasses a right to medical care for serious medical needs, including psychological needs." *Perez v. Oakland County*, 466 F.3d 416, 423 (6th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976)). "While the Eighth Amendment does not apply to pre-trial detainees, the Due Process Clause of the Fourteenth Amendment does provide them with a right to adequate medical treatment that is analogous to prisoners' rights under the Eighth Amendment." *Gray v. City of Detroit*, 399 F.3d 612, 615-16 (6th Cir. 2005) (citations omitted).

Because the Eighth Amendment prohibits mistreatment only if it is tantamount to "punishment," courts have imposed liability

12

upon prison officials only where they are "so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain." *Perez*, 466 F.3d at 423 (internal quotations and citation omitted). "Negligence or medical malpractice alone cannot sustain an Eighth Amendment claim, absent a showing of deliberate indifference." *Id.* (citing *Estelle*, 429 U.S. at 105-06).

"Deliberate indifference" has both an objective and a subjective component. *Id.* (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). With respect to medical needs, the need "must be objectively, 'sufficiently serious.'" *Id.* at 423-24 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). The Sixth Circuit has "clarified that the proper inquiry in a case where an inmate has committed suicide is 'whether the decedent showed a strong likelihood that he would attempt to take his own life in such a manner that failure [by a defendant] to take adequate precautions amounted to deliberate indifference to the decedent's serious medical needs.'" *Gray*, 300 F.3d at 616 (quoting *Barber v. City of Salem*, 953 F.2d 232, 239-40 (6th Cir. 1992).

"In considering the subjective component, this circuit has emphasized that a plaintiff must produce evidence showing that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact

13

draw the inference, and that he then disregarded that risk." *Id.* at 424 (internal quotations and citation omitted). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). *See also id.* at 842 (official must act or fail to act "despite his knowledge of a substantial risk of serious harm").

### 2. Qualified Immunity

Assuming a plaintiff raises a triable issue as to whether a constitutional violation occurred, a public official sued in his or her individual capacity may still be shielded from suit under the doctrine of qualified immunity. All defendants here assert this defense.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy,

14

J., dissenting)).

Traditionally, the qualified immunity defense required courts to engage in a "two-part, sequential analysis." *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). This analysis comprised the following questions: (1) whether the plaintiff has alleged facts which, when taken in a light most favorable to him, show that the defendant's conduct violated a constitutionally protected right; and, if so (2) whether that right was clearly established such that a reasonable official, at the time the act was committed, would have understood that his behavior violated that right. *Id.* (citing *Saucier v. Katz*, 533 U.S. 194 (2001)).

In *Pearson*, the Supreme Court revisited the question of whether the mandatory two-step procedure set out in *Saucier* should be retained. The Court reviewed the policy underlying the qualified immunity doctrine and noted that the *Saucier* framework had been rightly criticized for requiring courts to decide difficult constitutional questions under the first prong, even though that issue ultimately did not affect the outcome of the case. *Pearson*, 129 S. Ct. at 818. The Court also recognized as a practical matter that "there will be cases in which a court will rather quickly and easily decide that there was no violation of clearly established law before turning to the more difficult question whether the relevant facts make out a constitutional question at all." *Id.* at 820.

15

The Court concluded that the two-part framework of *Saucier* should no longer be mandatory, and that "the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Id.* at 821.

Therefore, exercising the discretion afforded by *Pearson*, this court will proceed directly to the second prong of the qualified immunity analysis: *viz*, if Jerauld's Eighth/Fourteenth Amendment right was violated, was that right "clearly established" such that a reasonable official would have known that he was violating it?[5]

"The burden of showing that the right was clearly established 'rests squarely with the plaintiff.'" *Perez v. Oakland County*, 466 F.3d 416, 427 (6th Cir. 2006) (quoting *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999)).

Moreover, the plaintiff must show that the right was clearly established "in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Saucier*, 533 U.S. at 201). "If reasonable officers could disagree about the lawfulness of the conduct in question, immunity must be

---

[5]Although this court will not conduct a separate analysis under the first prong of the *Saucier* test, the court concludes, based on the same evidence discussed below, that no violation of Jerauld's Eighth/Fourteenth Amendment right could be proven as a matter of law.

16

recognized." *Id.* (citation omitted).

The Sixth Circuit has recognized that there is no right to be screened correctly for suicidal tendencies. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001) (citations omitted). Rather, once a prisoner has been deemed suicidal, the clearly established right is the right to continuing medical treatment to address that risk. *Id.* at 702-704. Stated differently, "the right at issue here is the detainee's right to reasonable protection against taking his own life *if* that detainee has demonstrated a strong likelihood that he will commit suicide." *Bradley v. City of Ferndale*, 128 Fed. App'x 499, 506 (6th Cir. 2005) (italics in original).

With this question firmly in mind, the court will examine the facts as they pertain to each defendant. *See Phillips v. Roane County, Tenn.*, 534 F.3d 531, 542 (6th Cir. 2008) (noting that where court is faced with multiple defendants asserting qualified immunity defenses, it must "consider whether each individual defendant had a sufficiently culpable state of mind").

### 3. <u>Defendant Mark Kroger</u>

Reviewing all the facts that were within Kroger's knowledge, the court concludes that he is entitled to qualified immunity because Jerauld did not present a "strong likelihood" of committing suicide, and Kroger did not display deliberate indifference to Jerauld's medical needs.

17

Upon being contacted by Stilt and informed of the report that Jerauld had previously made a suicidal statement, Kroger reviewed both the IMF and the PSR which had been completed on Jerauld.  Although both forms contained numerous questions regarding the inmate's intent to harm himself and other questions designed to detect "red flags" of such a risk, Jerauld had answered "no" to each and every question.  That is, Jerauld denied having any intent to harm himself, and he indicated that he had no history of mental illness.

Indeed, this initial review by Kroger was not triggered by any display of self-injurious behavior or statements of suicidal intent by Jerauld while in custody.  Rather, Stilt referred Jerauld's case to Kroger only because of the third-hand report of the Erlanger officer.  There was no evidence that Jerauld had, in fact, showed any signs of harming himself after being arrested.

Plaintiff argues that Kroger displayed deliberate indifference by failing to obtain records of Jerauld's incarceration in November 2003, some two and a half months prior to this arrest.  On the IMF form that Jerauld completed then, he answered "yes" to the question of whether he was thinking of harming himself or someone else.  Plaintiff argues that, had Kroger known of this fact, he would have been alerted to Jerauld's risk for suicide.

This argument fails for two reasons.  First, the fact that

18

Jerauld had indicated thoughts of harming himself in November 2003 would not, contrary to plaintiff's assertion, have broadened Kroger's knowledge.   Kroger was *already* aware, based on the report from Stilt, that Jerauld had at some time in the recent past allegedly made a suicidal statement.   The November 2003 IMF thus would merely have duplicated what Kroger already knew of Jerauld's situation.

Second, this argument about what Kroger "should have" done amounts to an allegation of negligence, which the Supreme Court and the Sixth Circuit have emphasized may not form the basis for a deliberate indifference claim.   "The requirement that the official have subjectively perceived a risk of harm and then disregarded it is meant to prevent the constitutionalization of medical malpractice claims; thus, a plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment."   *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).   *See also Linden v. Washtenaw County*, 167 Fed. App'x 410, 421-22 (6th Cir. 2006) (noting that while potentially negligent behavior of psychiatrist may state claim for malpractice, it cannot be said to constitute a constitutional violation); *McKee v. Turner*, No. 96-3446, 1997 WL 525680, at *5 (6th Cir. Aug. 25, 1997) ("It is well-settled that even if Dr. Morcos's treatment constituted negligence or medical malpractice, it would not be actionable

19

under 1983.").

In both *Comstock* and *McKee*, the Sixth Circuit rejected the argument that a prison psychologist's failure to obtain additional records or to review more thoroughly an inmate's file showed deliberate indifference under the Eighth Amendment. *See McKee*, 1997 WL 525680, at *2, *5; *Comstock v. McCrary*, 142 Fed. App'x 242, 245 (6th Cir. 2005).

Moreover, while the parties dispute whether, at this time, Jerauld was on a "suicide" watch or a "medical" watch, the court finds such dispute immaterial. What was known to Kroger was that Stilt had already placed Jerauld on a 20-minute watch due to possible heroin withdrawal, during which Jerauld would remain in isolation and be under frequent observation by jail staff. Thus, Kroger knew that Jerauld was already receiving close attention and monitoring. That Kroger did not further recommend that Jerauld be labeled a "suicide risk" does not evidence deliberate indifference given the undisputed facts already discussed.

The undisputed facts regarding Kroger's interview with Jerauld two days later, on February 9, also fail to show either that Jerauld then presented a "strong likelihood" of suicide or that Kroger was deliberately indifferent to any such risk. Kroger probed Jerauld about the alleged past suicidal statement, and Jerauld credibly explained that he had merely said he would "rather be dead" than be in jail. Kroger directly asked Jerauld

20

if he intended to harm himself, and Jerauld flatly denied any such intent.  This interview was conducted in person, where Kroger was able to observe Jerauld closely and watch for any signs that, notwithstanding his verbal responses, Jerauld's demeanor indicated to the contrary.  Kroger observed no such signs.

Given this information and observation, Kroger's approval for Jerauld to be released into the general population at the conclusion of his medical watch cannot, as a matter of law, be said to show that Kroger knew that he was violating Jerauld's rights under the Eighth Amendment.

Plaintiff argues that, under the standard of professional care, Kroger should have conducted additional psychological tests rather than taking Jerauld's responses "at face value."  This argument, too, amounts to a claim of medical malpractice which is insufficient to evidence the sort of culpable state of mind required to raise a triable issue as to violation of the Eighth Amendment:

> The issue here is not whether Dr. Morcos committed medical malpractice, but rather whether Dr. Morcos had knowledge of facts about Jason Holland from which he drew the inference that his present course of treatment presented a substantial risk of serious harm to Holland, and that he actually drew that inference, but persisted in the course of treatment anyway.

*McKee v. Turner*, No. 96-3446, 1997 WL 525680, at *5 (6th Cir. Aug. 25, 1997).

21

Kroger did not see Jerauld after February 9, and no one reported to him any further information regarding any concerns or problems with respect to Jerauld.  Given all these facts, the court concludes that Kroger is entitled to dismissal of the federal claims against him on the grounds of qualified immunity.

### 4.   **Defendants Parker, Bell, Stilt, and Sams**

#### a. **Stilt**

Defendant Stilt's involvement with Jerauld was confined to the booking and intake process and Stilt's referral of Jerauld's case to Kroger for initial evaluation.  None of Stilt's action or inactions, however, raise any triable issue as to whether Stilt would have known that he was violating Jerauld's Eighth Amendment rights.

As previously noted, Jerauld's responses on the IMF indicated that he posed no risk for suicide.  Nonetheless, Stilt proceeded to interview Jerauld and complete a PSR.  Again, Jerauld's answers raised no reg flags regarding his mental health.  Again, however, Stilt took the additional step of referring the matter to Kroger for evaluation.

With respect to Jerauld's physical medical needs as they related to heroin withdrawal, Stilt placed Jerauld on a 20-minute medical watch, during which he was monitored closely and received medication for withdrawal symptoms.

On these facts, no reasonable juror could find that Stilt

22

exhibited deliberate indifference to Jerauld's medical needs or would have known that he was violating Jerauld's rights.  As the Supreme Court has noted, even where a prison official knows of an actual risk to an inmate's health or safety, they "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).  As a matter of law, no reasonable juror could find that Stilt responded unreasonably to Jerauld's needs, and he is thus entitled to qualified immunity.

### b.  <u>Sams</u>

Defendant Sams, who was Director of the Medical Unit, had only two direct contacts with Jerauld during his confinement at the KCDC.  The first was on February 9, when Jerauld asked Sams to have him released from medical watch into a general population cell.  Sams told him that was not her call to make, and she asked him if he was experiencing any withdrawal or emotional problems. He said he was not.  Sams then reviewed Jerauld's isolation log, spoke to a deputy who had been monitoring him, and then called Kroger.  Following Kroger's evaluation and his determination that Jerauld could be released into the general population, Sams approved that action.  Under these facts, Sams cannot be said to have acted with deliberate indifference to Jerauld's medical needs.  *See Linden v. Washtenaw County*, 167 Fed. App'x 410, 418-19 (6th Cir. 2006) (holding that nurse who implemented advice of

23

psychiatrist that detainee be removed from suicide precautions did not display deliberate indifference; fact that had she made different decision suicide may have been averted does not give rise to culpability under the Eighth Amendment).

Sams's second contact with Jerauld was on February 11, when Jerauld asked her to keep the extra blanket that Bell had authorized. Sams observed that Jerauld was alert, did not appear to be in distress, and that he did not have tremors. Jerauld also denied cramping or loose stools. Sams directly asked Jerauld if he was thinking of hurting himself, and he assured her he was not. Sams told Jerauld that a physician would follow up with him in the morning.

Again, none of these facts indicate that Sams believed that Jerauld posed a strong likelihood of attempting suicide, or that she persisted in a course of conduct that exhibited deliberate indifference to any such risk. She is, therefore, entitled to qualified immunity.

### c. **Parker and Bell**

Defendants Parker and Bell each had only one direct contact with Jerauld prior to his attempted suicide. On February 10, Jerauld flagged Bell to the door of his cell and told him that he was cold and wanted an extra blanket. Bell authorized the extra blanket. In his deposition, Bell testified that Jerauld did not appear to be suffering from withdrawal and that Bell's only

24

concern was that the cell was cold.  These facts exhibit no deliberate indifference on Bell's part.

Similarly, Parker saw Jerauld on the evening of February 11. Jerauld told Parker that he was suffering withdrawal symptoms and "couldn't take it."  Parker assured Jerauld that she would ensure that the CMA saw him first on the next medication pass that very evening.

These facts do not demonstrate that Parker perceived, or even should have perceived, that Jerauld presented a strong likelihood of suicide, nor that she persisted in a course of conduct deliberately indifferent to any such risk.

Bell and Parker are thus both entitled to qualified immunity.

### 5.    Defendants Carl and Ballard

Liability under a § 1983 claim cannot be based on *respondeat superior. Monell v. New York City Dep't of Social Services,* 436 U.S. 658 (1978).  Instead, to impose supervisory liability, there must be a showing that defendants "either encouraged the specific incident or in some other way directly participated in it." *Bremiller v. Cleveland Psychiatric Inst.*, 879 F. Supp. 782, 793 (N.D. Ohio 1995) (*citing Hays v. Jefferson County,* 668 F.2d 869 (6th Cir. 1982)).  "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct

25

of the offending subordinate." *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984).

It is undisputed that neither Carl nor Ballard had any contact, direct or indirect, with Jerauld during the time that he was held at the KCDC.  It is important to note that plaintiff has not sued these two defendants in their official capacities, nor has she named the county as a defendant under a theory of municipal liability.

Therefore, plaintiff's attempt to hold Carl and Ballard individually liable under theories of failure to train and promulgate adequate policies fails.  *See Phillips v. Roane County, Tenn.*, 534 F.3d 531, 543-44 (6th Cir. 2008).  The Sixth Circuit directly rejected such a claim against supervisor defendants in *Phillips*, noting that such a theory "improperly conflates a § 1983 claim of individual supervisor liability with one of municipal liability." *Id.* at 543.  *See also Linden v. Washtenaw County*, 167 Fed. App'x 410, 419-20 (6th Cir. 2006) (rejecting supervisory liability claim against jail official sued in his individual capacity).

Because neither Carl nor Ballard had any involvement in Jerauld's evaluation or care while held at the KCDC, the Eighth Amendment claim against them fails as a matter of law.  *See also Farmer v. Brennan*, 511 U.S. 825, 844 (1994) (noting that prison officials who lacked knowledge of a risk cannot be said to have

26

inflicted punishment under the Eighth Amendment).


     **C.**   **State Law Claims**

     Because the court is dismissing plaintiff's federal causes of action, and because her state law claims present complex questions of immunity under Kentucky law, the court will decline to exercise its supplemental jurisdiction over the state claims. *See* 28 U.S.C. § 1367(c).  Those claims will thus be dismissed without prejudice.

### *Conclusion*

     As the Sixth Circuit has noted, "[s]uicide is a difficult event to predict and prevent and often occurs without warning." *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005).  Such was clearly the case here, with tragic results.  The Eighth Amendment, however, protects only against deliberately indifferent treatment of prisoners by state officials acting with a sufficiently culpable state of mind.  Based on all the facts construed in plaintiff's favor, the court concludes that none of the defendants demonstrated such a state of mind towards Jerauld, and qualified immunity must be granted.


     Therefore, having reviewed this matter, and the court being otherwise sufficiently advised,

     **IT IS ORDERED** that:

(1) Defendants' motions for summary judgment (Doc. #67, #69, #74) be, and are hereby, **GRANTED,** and all federal claims be, and are hereby, **DISMISSED WITH PREJUDICE**;

(2) Defendants' motions to strike (Doc. #97, #98) be, and are hereby, **DENIED**; and

(3) The court declines to exercise its supplemental jurisdiction over plaintiff's state law claims, and those claims be, and are hereby, **DISMISSED WITHOUT PREJUDICE.**

A separate judgment shall enter concurrently herewith.

This 19th day of March, 2009.



**Signed By:**

_**William O. Bertelsman**_

**United States District Judge**